# COMPOSITE EXHIBIT A

Account Number:

# Wachovia Bank, National Association
# Prime Equity Line of Credit Agreement & Disclosure Statement

Date of Agreement July 10, 2003

Maximum Credit Limit $ 247000.00

Borrower(s)

MARGARET N ALEXANDER

The Prime Equity Line of Credit Agreement & Disclosure Statement ("Agreement") contains the terms which apply to the Prime Equity Line Account ("Account") with Wachovia Bank, National Association. The words "I," "me," and "my," which also mean "we," "us," and "our," if more than one Borrower, mean the person or persons signing this Agreement. The words "you," "your," and "yours" mean Wachovia Bank, National Association ("Wachovia Bank, N.A.").

## ACCESSING THE PRIME EQUITY LINE
Wachovia Bank, N.A. will establish an Account and issue to me Prime Equity Line Checks and if applicable law permits, a Credit Card Access Device ("Card"). The Prime Equity Line Checks and Card can be used to obtain Advances from my Account during the Draw Period, up to the amount of the Maximum Credit Limit established in this Agreement. Wachovia Bank, N.A. will charge all Advances obtained under the terms of this Agreement to my Account. Advances made pursuant to Prime Equity Line Checks will be for the amount of the Prime Equity Line Check. Advances made pursuant to the use of a Card will be for the amount of the purchase or for the amount of the Advance obtained with the Card at any ATM or other outlet.

If I have a Demand Deposit Account with you and I request you to initiate an Advance from my Account, so that items presented against my Demand Deposit Account which would otherwise overdraw my Wachovia Bank, N.A. Demand Deposit Account are honored, I agree that Wachovia Bank, N.A. may charge such Advances to my Account and that such Advances shall be in increments of $100.00.

I agree that any Prime Equity Line Checks or Cards that you supply to me are your property and must be returned to you immediately upon demand if I am in Default of this Agreement or my Advance privileges are terminated or suspended in accordance with the terms of this Agreement.

## MAXIMUM CREDIT LIMIT
My Maximum Credit Limit is indicated above. I agree never to allow the Outstanding Balance due on my Account to exceed the Maximum Credit Limit. I also agree that you are not obligated to pay any Advance or other charge against my Account that would make my Account Outstanding Balance exceed my Maximum Credit Limit. I agree to immediately repay, upon demand, any Outstanding Balance that exceeds the Maximum Credit Limit established hereunder. Any increases in my Maximum Credit Limit I request will require that a new application be approved in accordance with your then applicable underwriting standards and I must sign any additional agreements that in your opinion are necessary to secure your interest.

## DRAW PERIOD
Except as provided herein and unless terminated earlier in accordance with the terms of this Agreement, I may obtain Advances under the terms of this Agreement for twenty (20) years from the Date of Agreement ("Draw Period"). For Accounts secured by property located in Connecticut, the Draw Period is ten (10) years from the Date of Agreement.

## OBLIGATION TO LEND
You are absolutely obligated under the terms of this Agreement to make Advances not to exceed, at any one time in the aggregate, the amount indicated as the Maximum Credit Limit and I agree to repay any Advances under the terms of this Agreement. Your obligation to make Advances to me under this Agreement ends when the right to obtain Advances terminates at the end of the Draw Period or when such Advance privileges are suspended or terminated in accordance with the terms of this Agreement.

## FINANCE CHARGE ON MY ACCOUNT BALANCE

(a) My Account has a monthly billing cycle. A Finance Charge computed on a monthly periodic rate will be imposed, if at the end of any day of the billing cycle, there is a balance owing on my Account. The monthly periodic rate for an initial Advance, if any, made by you will begin to accrue on the date of this Agreement. The monthly periodic rate for any Advance other than an initial Advance will begin to accrue on the Transaction Date as indicated on my billing statement.

(b) You will figure the Finance Charge on my Account by applying the monthly periodic rate to the "average daily balance" owing on my Account (including current transactions). To calculate the "average daily balance" you will take the beginning balance of my Account each day, add any new Advances and Fees charged to the Account pursuant to the terms of this Agreement, and subtract any payments or credits. This gives you the daily balance. Then, you will add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives you the "average daily balance."

(c) The Finance Charge imposed during a billing cycle will be determined by applying the monthly periodic rate that is 1/12 of the corresponding ANNUAL PERCENTAGE RATE to the average daily balance. The ANNUAL PERCENTAGE RATE and monthly periodic rate are variable rates and are subject to change on the first day of each billing cycle, if there was a prior change in the index, which is the Prime Rate as regularly published in the Eastern edition of The Wall Street Journal ("Prime Rate").



1

(10/02) Multistate Prime Agreement

(d) If the Prime Rate becomes unavailable, you will select a new index which is based on a historical movement substantially similar to the original Index and the new index and margin will result in an ANNUAL PERCENTAGE RATE substantially similar to the rate in effect at the time the Prime Rate becomes unavailable. You will give me notice of this change.

(e) The corresponding ANNUAL PERCENTAGE RATE is effective as of the 1st day of the calendar month in which you receive your Statement and is based on the Prime Rate as published in the Eastern edition of *The Wall Street Journal* on the 25th day of the prior calendar month plus a Margin of ___0.00___ %. If more than one Prime Rate is published on the 25th day of the prior calendar month, you will use the higher rate as the Prime Rate. If the Prime Rate is not published on the 25th day of the prior calendar month, the Index will be the Prime Rate published on the last business day prior to the 25th.

(f) During the first twelve months of the Agreement, as measured from the date of the Agreement ("Initial Period"), if I take Advances totaling at least $5,000.00, the ANNUAL PERCENTAGE RATE will be discounted for the remaining months left in the Initial Period. During the Initial Period, the ANNUAL PERCENTAGE RATE will equal the Index (WSJ Prime Rate) plus the discounted Margin which is ___0.00___ %. The ANNUAL PERCENTAGE RATE for the Initial Period is not based on the Margin that is used to make later rate adjustments. After the Initial Period, the ANNUAL PERCENTAGE RATE for the remaining term of the Agreement will be determined in accordance with subsection (e) above.

(g) Assuming that the discounted ANNUAL PERCENTAGE RATE is not in effect, the initial monthly periodic rate of ___0.354___ % will apply to my average daily balance during my first billing cycle and the initial corresponding ANNUAL PERCENTAGE RATE will be ___4.250___ %. An increase in the ANNUAL PERCENTAGE RATE and monthly periodic rate will result in increased Finance Charges and minimum payment amounts. The corresponding ANNUAL PERCENTAGE RATE for each billing cycle will be shown on my billing statement for that cycle. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

(h) The maximum ANNUAL PERCENTAGE RATE will never exceed eighteen percent (18%). In North Carolina, the maximum ANNUAL PERCENTAGE RATE will never exceed sixteen percent (16%).

**Other Charges.** In addition to the FINANCE CHARGE which will be added to my Account each billing cycle, I will pay the following real estate closing and security filing fees.

| | "X" = Wachovia Bank, N.A. Pays Fee | | "X" = Wachovia Bank, N.A. Pays Fee |
|---|---|---|---|
| Survey | $ | Georgia Mortgage Fee | $ |
| Title Examination | $ 55.00 | Settlement Fee | $ |
| Title Insurance | $ | Points | $ |
| Recording Fee | $ 28.50 | Commitment Fee | $ |
| Appraisal Fee | $ 7.00 | Broker Fee | $ |
| Flood Certification Fee | $ 11.50 | Additional Settlement Fee | $ |
| Intangible Tax | $ 494.00 | | $ |
| Document Stamp Tax | $ 864.50 | | $ |
| | | **TOTAL** | $ 1460.50 |

**WACHOVIA BANK, N.A. FEES PAID** $_____   **CUSTOMER FEES PAID** $ 1460.50

☐ **Closing Cost Repayment Option.** If checked, I request that you pay the Other Charges indicated with an "X" above for me. I will pay the remaining Other Charges not so indicated. In consideration of your payment of the Other Charges indicated above I agree to reimburse you for the Other Charges that you have paid on my behalf, in the event I pay the entire Outstanding Balance and close this Account on or before one calendar year after the opening date of this Account. If I pay the entire Outstanding Balance and close this Account after one year, but on or before two calendar years after the opening date of this Account, I agree to reimburse you fifty percent (50%) of the amount of closing costs you paid for me. I understand that I may pay my entire Outstanding Balance at any time without having to reimburse you for the closing costs as long as my Account remains open.

**Statement.** If I have an Outstanding Balance or a credit balance in excess of $1.00 or if there is any Finance Charge imposed during a billing cycle, you will send me a Statement. I promise to pay you in accordance with the terms of this Agreement in United States Dollars drawn on an institution located in the United States. I understand I am prohibited from using an Advance to make my payments on this Account. I agree to be responsible for any fees or costs associated with the processing of my payments on my Account should I use a method of payment that results in extra costs or fees being assessed to you.

**Payment Schedule.** During the Draw Period, I agree to pay the minimum monthly payment not later than the payment due date shown on my Statement as follows:

☒ Option A: I will make a minimum monthly payment equal to the greater of the Finance Charge on the outstanding Advances plus accrued but unpaid Fees or $50.00.
☐ Option B: I will make a minimum monthly payment of the greater of 1.5% of the Outstanding Balance shown on my Statement or $50.00.

Upon expiration of the Draw Period, I will make a minimum monthly payment of the greater of 2% of the Outstanding Balance shown on my Statement or $50.00 until the entire Outstanding Balance is paid in full.

If at any time, the Outstanding Balance is less than $50.00, the minimum monthly payment will be the Outstanding Balance.

For purposes of this Agreement, the term "Outstanding Balance" includes all unpaid Advances, accrued but unpaid Finance Charges and accrued but unpaid Fees permitted to be charged to my Account under the terms of this Agreement or the Security Instrument.

**Application of Payments.** Unless otherwise prohibited by applicable law, payments will be applied in the following order: First, to the accrued but unpaid promotional Finance Charges due; next to non-promotional Finance Charges due, next to any Fees that that have been charged in accordance with the terms of this Agreement. The remainder of any payment will be applied first to any unpaid promotional Advances and then to any non-promotional Advances. Promotional Advances

and Finance Charges refer to offers to use my Account on special terms that you may make to me from time to time; you will provide the terms of any promotional Advance or promotional Finance Charge at the time that you make the offer available. I understand that making more than the minimum payment may not advance my next payment due date.

**Minimum Monthly Payment Change.** Subject to your approval, during the Draw Period, I agree that I may change my minimum payment option to any option listed above upon written notice of my request to change my minimum payment option.

> PAYMENT IN FULL. I AGREE THAT THE NOTE HOLDER MAY ACCEPT PAYMENTS MARKED "PAID IN FULL" WITHOUT ANY LOSS OF THE NOTE HOLDER'S RIGHTS UNDER THIS NOTE UNLESS I SEND THEM FOR SPECIAL HANDLING TO WACHOVIA BANK, N.A. EQUITY LINE SERVICES, VA 0343, PO BOX 13327, ROANOKE, VA 24040.

**Late Fee.** I agree that any Late Fee imposed by you will be charged to my Account.

If this Agreement is governed by New York law and all of a minimum monthly payment is not received within fifteen (15) days of the due date provided on my Statement, you will impose a Late Fee of two percent (2%) of the amount of the minimum monthly payment.

If this Agreement is governed by North Carolina law and all of a minimum monthly payment is not received within fifteen (15) days of the due date provided on my Statement, you will impose a Late Fee of four percent (4%) of the amount of the minimum monthly payment.

If this Agreement is governed by South Carolina law and is secured by a subordinate lien on real property and all of a minimum monthly payment is not received within ten (10) days of the due date provided on my Statement, you will impose a Late Fee of the lesser of $13.50 or five percent (5%) of the amount of the minimum monthly payment but not less than $5.40. Otherwise, if all of a minimum monthly payment is not received within ten (10) days of the due date provided on my Statement, you will impose a Late Fee of five percent (5%) of the amount of the minimum monthly payment.

If this Agreement is governed by a law other than those listed in this Section (above) and all of a minimum monthly payment is not received within ten (10) days of the due date provided on my Statement, you will impose a Late Fee of five percent (5%) of the amount of the minimum monthly payment.

**Return Items Fee.** If I make a payment to my Account by check or draft and the check or draft is returned unpaid for any reason, I agree to pay a charge of $20.00 for each returned check or draft. If this Agreement is governed by Maryland law and I make a payment to my Account by check or draft and the check or draft is returned unpaid for any reason, I agree to pay a charge of $15.00 for each returned check or draft. I agree that this fee will be charged to my Account.

**Stop Payment Fee.** If I request you to stop payment on an Advance made with a Prime Equity Line Check, to the extent not prohibited by applicable law, I agree to pay your scheduled fee for such service. I will be notified of the amount of such fee at the time that such action is requested. I agree that this fee will be charged to my Account.

**Administrative/Servicing Fees.** I agree that, if after closing, I request other services related to servicing or administering my Account for which you have a scheduled charge, to the extent not prohibited by applicable law, I will pay you the then current fee for such services or request if you agree to perform such services or request. I will be notified of the amount of the fee at the time that such action is requested. I agree that any such fees will be charged to my Account.

**Agreement Secured by Security Instrument.** In addition to the protections given to you under this Agreement, a Security Instrument on real property (the "Property") described in the Security Instrument and dated the same date as this Agreement, protects you from possible losses which might result if I do not keep the promises which I make in this Agreement. The Security Instrument describes how and under what conditions I may also be required to make immediate payment in full of all amounts I owe under this Agreement.

**Change of Terms of This Agreement.** In addition to other rights you may have under the terms of this Agreement, you may change the terms and conditions of this Agreement when any of the following events shall occur:
(1) if the index and margin used with this Account are no longer available;
(2) if you make a change that I specifically agree to in writing;
(3) if you make a change that will unequivocally benefit me throughout the remainder of the term of this Agreement; or
(4) if you make any insignificant change in the terms of this Agreement.

**Suspension and/or Reduction of Credit Limit.** I agree that you may prohibit additional Advances or reduce the Maximum Credit Limit when any of the following events shall occur:
(1) if the value of the Property that secures this Agreement declines significantly below the Property's appraised value during the time of this Agreement;
(2) if you reasonably believe I will be unable to fulfill the repayment obligations under this Agreement due to a material change in my financial circumstances;
(3) if I am in default of any material obligations under this Agreement, such material obligations include, but are not limited to, all of my promises in this Agreement regarding the payment of money to you and the preservation of your rights in the Property;
(4) if action by a governmental body does not allow you to impose the ANNUAL PERCENTAGE RATE currently applicable to this Agreement;
(5) if action by a governmental body adversely affects the priority of your Security Instrument to the extent that the value of the security interest is less than 120 percent of the amount of my Maximum Credit Limit;
(6) if you are notified by a governmental agency that regulates your lending activities that continuing Advances constitutes an unsafe and unsound practice;
(7) if during any period in which the ANNUAL PERCENTAGE RATE corresponding to the monthly periodic rate reaches the maximum interest rate allowed under this Agreement. Provided I am in compliance with the other terms of this Agreement, I understand you will reinstate credit privileges if the ANNUAL PERCENTAGE RATE declines below the maximum ANNUAL PERCENTAGE RATE; or
(8) if I request that you suspend any Advance or reduce the Maximum Credit Limit.

Reinstatement of Advance Privileges. Except as provided for in this Agreement, I understand that if my Advance privileges are suspended or my Maximum Credit Limit is reduced, it is my responsibility to request reinstatement of my Advance privileges that have been suspended. If I request reinstatement of my Advance Privileges, I further understand that I may be required to pay for an appraisal of the Property to determine if the value has changed.

If you suspend Advances or reduce the Maximum Credit Limit, I understand you will mail or deliver written notice of your action no later than three business days after the action and that such notice will contain the specific reason for the action.

Default/Termination. I will be in default if any of the following events shall occur:
    (1) if I fail to make my payments when they are due;
    (2) if I have engaged in fraud or material misrepresentation in connection with my Account;
    (3) if my action or inaction adversely affects the Property or your rights in the Property or I am in breach of any term of the Security Instrument, or
    (4) if I breach any term of this Agreement.

If I am in Default under the terms of this Agreement, you may, at your option and in your sole discretion, take the following action:
    (1) terminate my Advance privileges and demand the Outstanding Balance to be due and payable immediately in full in a single payment, with interest due on the Balance at the ANNUAL PERCENTAGE RATE as provided for in this Agreement until paid, or
    (2) temporarily or permanently prohibit additional Advances or reduce the Maximum Credit Limit without demanding payment in full.

If you do not immediately terminate the Advance privileges and demand repayment of the Outstanding Balance, such action shall not constitute a waiver of your right to subsequently terminate the Account or demand repayment of the Outstanding Balance at a later time, if the event of Default still exists or another event of Default occurs at that time.

In the event of Default, if I do not immediately pay the Outstanding Balance and if this obligation is referred to an attorney-at-law for collection, who is not a salaried employee of you, to the extent not prohibited by applicable law, you will have the right to collect attorney fees not exceeding fifteen percent (15%) of the Outstanding Balance along with court costs and expenses. Any default of this Agreement will also constitute an event of Default of the Security Instrument securing my performance of the obligations set forth in this Agreement. Upon Default, you may proceed to enforce the terms of this Agreement or enforce any rights that you may have under the Security Instrument.

"DEFAULT IN THE PAYMENT OF THE LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THIS LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS LOAN. IF YOU HAVE THIS RIGHT, THE LENDER IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT."

Termination by Less than All Borrowers. If one or more persons are liable under the terms of this Agreement and less than all of said persons request in writing that future Advances be terminated or temporarily suspended hereunder, you will block and otherwise suspend further Advance privileges. Upon receipt of such notice from one or all of us, you will provide written notice to all Borrowers that the Advance privileges have been suspended. I understand that said Advance privileges will not be reinstated by you until you receive a written request from all persons liable on this Account requesting reinstatement of the Advance privileges. I further agree that any request to grant reinstatement will be made at the sole discretion of you and in accordance with your policies in effect at the time such request is made.

I understand that during the time of any such suspension or termination that I must continue to abide by the terms of the Agreement including, but not limited to the Payment Schedule.

Voluntary Termination. I can cancel my Account at any time by destroying all of my unused Prime Equity Line Checks and any Card Access Devices that may have been issued in connection with my Account and sending you a signed letter requesting that you cancel my Account. I understand that my obligations under this Agreement and any changes made under it prior to cancellation will continue to apply until I have completely paid the Outstanding Balance on the Account.

Required Property and Flood Insurance. I agree to purchase and to continue to maintain property insurance (and flood insurance if so required) on the secured Property in an amount not less than the entire Outstanding Balance for all prior and current obligations secured by my Property or in such an amount satisfactory to you. I understand I may purchase required property and flood insurance from anyone I choose who is acceptable to you. I agree that in the event I am required to purchase property and/or flood insurance and fail to do so that you may purchase said insurance on my behalf and add the amount of the premium to my then Outstanding Balance. I agree that you have an irrevocable power of attorney to file proofs of loss or other insurance claims and anything else to obtain insurance proceeds in my name.

Assignment/Transfer of Account. I cannot transfer or assign my Account or this Agreement to any other person, however, I agree you can assign or transfer this Agreement and the Security Instrument securing this Agreement.

Change of Address. I will advise you promptly if I change my mailing address or if I sell the Property securing this Account.

Notices. All written notices and statements from you to me will be considered given when placed in the United States mail, postage paid, and addressed to me at my current address as it appears in your records. If this is a joint Account, written notice to one person is notice to all persons.

Removal of Security Interest. At any time when the Outstanding Balance secured by the Security Instrument is zero, you shall, at my written request, execute a Satisfaction and provide me with a recorded copy. Absent my request, the Security Instrument will remain in full force and effect until the Draw Period has expired and the Outstanding Balance is paid in full.



**Governing Law.** I agree that this Agreement shall be governed by and interpreted entirely under the law of the State where the Property securing this Agreement is located and applicable federal law. If the Property securing the Agreement is located in Maryland, this Agreement is governed by MD Code Ann., Commercial Law §12-1001 et seq. and applicable federal law

**Other Provisions.** Each of us who signed this Agreement is individually and jointly obligated for all payments due under this Agreement. If you request, I will give you any information needed to reevaluate my Account or my creditworthiness. You may, at any time, seek information about my financial condition from others including but not limited to obtaining a consumer report from a Consumer Reporting Agency. You may use the information obtained from a Consumer Reporting Agency to market additional products or services to me. In the event that the amount of interest on my Account exceeds the maximum permitted by law, you agree to repay me upon demand the amount paid which exceeds the maximum interest rate, or at your option, to reduce the then Outstanding Balance by the excess amount of interest. This Agreement constitutes the entire Agreement between the parties. If any part of this Agreement is not valid, all other parts will remain enforceable. I understand I should consult a tax advisor regarding the deductibility of interest and charges for my Account.

**CAUTION – IT IS IMPORTANT THAT YOU READ ALL PAGES OF THIS AGREEMENT BEFORE YOU SIGN IT. DO NOT SIGN THIS AGREEMENT IF IT CONTAINS ANY BLANK SPACES.**

By signing below, I agree to all of the above terms and certify that I received a completed copy of this Agreement.

_Margaret N. Alexander_
Borrower
MARGARET N ALEXANDER

_____
Borrower

_____
Borrower

5

(10/02) Multi-State Pet Agreement

# MY BILLING RIGHTS

## I SHOULD KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about my rights and your responsibilities under the Fair Credit Billing Act.

### I SHOULD NOTIFY YOU IN CASE OF ERRORS OR QUESTIONS ABOUT MY STATEMENT.

If I think my Statement is wrong, or if I need more information about a transaction on my Statement, I should write you on a separate sheet at the address listed on my Statement. I should write you as soon as possible. You must hear from me no later than 60 days after you sent me the first statement on which the error or problem appeared. I can telephone you, but doing so will not preserve my rights.

In my letter, I must give you the following information:

- My full name and PEL Account Number.
- The dollar amount of the suspected error.
- I must describe the error and explain, if I can, why I believe there is an error. If I need more information, I should describe the item I am not sure about.

### MY RIGHTS AND YOUR RESPONSIBILITIES AFTER YOU RECEIVE MY WRITTEN NOTICE.

You must acknowledge my letter within 30 days, unless you have corrected the error by then. Within 90 days, you must either correct the error or explain why you believe the Statement was correct.

After you receive my letter, you cannot try to collect any amount I question, or report me as delinquent. You can continue to bill me for the amount I question, including finance charges, and you can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while you are investigating, but I am still obligated to pay the parts of my Statement that are not in question.

If you find that you made a mistake on my Statement, I will not have to pay any finance charges related to any questioned amount. If you didn't make a mistake, I may have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, you will send me a statement of the amount I owe and the date that it is due.

If I fail to pay the amount that you think I owe, you may report me as delinquent. However, if your explanation does not satisfy me and I write to you within ten days telling you that I still refuse to pay, you must tell anyone you report me to that I have a question about my Statement. And, you must tell me the name of anyone you reported me to. You must tell anyone you report me to that the matter has been settled between us when it finally is.

If you don't follow these rules, you can't collect the first $50 of the questioned amount, even if my Statement was correct.



6  (10/02) Multi-State Pel Agreement

Prepared By:
JILL DIETRICH
Wachovia Bank, National Association
Retail Credit Servicing
P.O. Box 50010
Roanoke, VA 24022

Return To:
Wachovia Bank, National Association
Retail Credit Servicing
P O Box 50010
Roanoke, VA 24022

OR BK 2524 Pages 679 - 684
RECORDED 07/29/03 14 41 22
MARTHA INGLE, WALTON COUNTY
CLERK OF COURT
DOC STMP-M $864 50
INT TAX $494 00
DEPUTY CLERK S KELLEY
#3

## OPEN-END MORTGAGE

THIS MORTGAGE is made this day 10 July, 2003 between the Mortgagor, MARGARET N. ALEXANDER, TRUSTEE ;OF THE MARGARET N. ALEXANDER ;REVOCABLE TRUST DATED 04/26/2001;

(herein "Borrower"), and the Mortgagee, Wachovia Bank, National Association, a national banking association organized and existing under the laws of the United States of America, whose address is Wachovia Bank, National Association, 301 South College Street, NC 0630, Charlotte, North Carolina 28288-0630 (herein "Lender").

The Lender has made a loan to Borrower the maximum indebtedness at any one time shall not exceed U.S $ 247000.00 which loan is an open-end line of credit as evidenced by Borrower's Prime Equity Line of Credit Agreement and Disclosure Statement dated 07/10/03 and extensions, modifications and renewals thereof (herein "Note") which provides for obligatory advances of all or part of the loan proceeds from time to time, subject to provisions in the Note. The entire indebtedness evidenced by the Note, if not sooner paid, will be due and payable on 07/09/43.

THIS MORTGAGE secures a Note that provides for changes in the interest rate, as more particularly described in said Note. In case of a conflict between the Note and this Mortgage governing the terms of the remedies of default or termination of advances, the terms of the Note shall control.

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage, and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender the following described Property located in the County of WALTON , State of Florida:

DEED DATE 05/07/01 RECORDED 05/10/01 BOOK/INST: 2309 PAGE: 4119

SEE ATTACHED LEGAL DESCRIPTION

which has the address of 420 OAK HARBOUR LN UNIT 205
DESTIN FL 32541

(herein "Property Address").

TOGETHER with all the improvements now or hereafter erected on the Property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the Property covered by this Mortgage; and all of the foregoing, together with said Property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property."

Any Rider ("Rider") attached hereto and executed of even date is incorporated herein and the covenants and agreements of the Rider shall amend and supplement the covenants and agreements of this Mortgage, as if the Rider were a part hereof.

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Obligation to Lend.** Lender is absolutely obligated under the terms of the Note to make advances not to exceed, at any one time in the aggregate, the amount stated in the Note and Borrower has agreed to repay any advances under the terms of the Note. Lender's absolute obligation to make advances to Borrower under the Note ends when Lender terminates the right to make advances and demands repayment of the outstanding obligation or prohibits additional extensions of credit under the Note or this Mortgage. Nevertheless, Lender may waive the right to terminate or prohibit additional advances. If Lender does not terminate or prohibit additional advances, Lender remains obligated to make advances to Borrower under the terms of the Note. However, that waiver does not bind Lender if the same or a different event occurs or is continuing at a later time.

2. **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note. This Mortgage secures payment of said Note according to its terms, which are incorporated herein by reference.

3. **Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations, under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

4. **Hazard Insurance.** a) Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards, including but not limited to floods, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with section 6.

b) All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgagee clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

c) Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Mortgage, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Mortgage, whether or not then due. The 30-day period will begin when the notice is given.

d) Except as provided in subsection 4(e) below, should partial or complete destruction or damage occur to the Property, Borrower hereby agrees that any and all instruments evidencing insurance proceeds received by Lender as a result of said damage or destruction, shall be placed in a non-interest bearing escrow account with Lender. At Lender's discretion, Lender may release some or all of the proceeds from escrow after Borrower presents Lender with a receipt(s), invoice(s), written estimates(s) or other document(s) acceptable to Lender which relates to the repair and/or improvements of the Property necessary as a result of said damage and/or destruction. Absent an agreement to the contrary, Lender shall not be required to pay Borrower any interest on the proceeds held in the escrow account. Any amounts remaining in the account after all repairs and/or improvements have been made to Lender's satisfaction, shall be applied to the sums secured by this Mortgage. Borrower further agrees to cooperate with Lender by endorsing all checks, drafts and/or other instruments evidencing insurance proceeds and any necessary documents. Should Borrower fail to provide any required endorsement and/or execution within 30 days after Lender sends Borrower notice that Lender has received an instrument evidencing insurance proceeds, or document(s) requiring Borrower's signature, Borrower hereby authorizes Lender to endorse said instrument and/or document(s) on Borrower's behalf, and collect and apply said proceeds at Lender's option, either to restoration or repair of the Property or to sums secured by this Mortgage. It is not the intention of either party that this escrow provision, and/or Lender's endorsement or execution of an instrument(s) and/or document(s) on behalf of Borrower create a fiduciary or agency relationship between Lender and Borrower.

e) Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in section 2 or change the amount of the payments. If under section 16 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Mortgage.

5. **Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the Declaration of covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

6. **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such actions as is necessary to protect Lender's interest.

Any amounts disbursed by Lender pursuant to this section 6, with interest thereon from the date of disbursal, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon



2

(2/02) FL Mortgage Open-End

notice from Lender to Borrower requesting payment thereof. Nothing contained in this section 6 shall require Lender to incur any expense or take any action hereunder.

7. **Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefore related to Lender's interest in the Property.

8. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

9. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Borrower shall remain liable for full payment of the principal and interest on the Note (or any advancement or obligation) secured hereby, notwithstanding any of the following: (a) the sale of all or a part of the premises; (b) the assumption by another party of Borrower's obligations hereunder; (c) the forbearance or extension of time for payment or performance of any obligation hereunder, whether granted to Borrower or a subsequent owner of the Property; and (d) the release of all or any part of the premises securing said obligations or the release of any party who assumes payment of the same. None of the foregoing shall in any way affect the full force and effect of the lien of this Mortgage or impair Lender's right to a deficiency judgment (in the event of foreclosure) against Borrower or any party assuming the obligations hereunder, to the extent permitted by applicable law. Any forbearance by Lender in exercising any right or remedy hereunder or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

10. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Mortgage but does not execute the Note (a "co-signer"): (a) is co-signing this Mortgage only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Mortgage; (b) is not personally obligated to pay the sums secured by this Mortgage; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Mortgage or the Note without the co-signer's consent.

Subject to the provisions of section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Mortgage in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Mortgage. Borrower shall not be released from Borrower's obligations and liability under this Mortgage unless Lender agrees to such release in writing. The covenants and agreements of this Mortgage shall bind and benefit the successors and assigns of Lender.

11. **Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by first class mail addressed to Borrower or the current owner at the Property Address or at such other address as Borrower may designate in writing by notice to Lender as provided herein, and any other persons personally liable on the Note as their names and addresses appear in Lender's records at the time of giving notice and (b) any notice to Lender shall be given by first class mail to Lender's address at Wachovia Bank, National Association, Retail Credit Servicing, P.O. Box 50010, Roanoke, VA 24022 or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

12. **Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflicts shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

13. **Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note, this Mortgage and Rider(s) at the time of execution or after recordation hereof.

14. **Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

15. **Transfer of the Property or a Beneficial Interest in Borrower; Assumption.** As used in this section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with section 11 within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies by this Mortgage without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

16. **Default; Acceleration; Remedies.** Upon Borrower's breach of any covenant or agreement of Borrower in this entire Mortgage, including the covenants to pay when due any sums under the Note secured by this Mortgage, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without demand or notice, notice of the exercise of such option being hereby expressly waived. Lender may invoke the power of sale hereby granted. Lender shall have the right to enter upon and take possession of the Property hereby conveyed and after or without taking such possession shall have the right to sell the same at public auction for cash, after first giving notice of the time, place and terms of such sale by publication once a week for three consecutive weeks prior to said sale, in some newspaper published in said county, and upon payment of the purchase money, Lender, or owner of the debt and this Mortgage, or auctioneer, shall execute to the purchaser for and in the name of Borrowers, a good and sufficient deed to the Property sold. Lender shall apply the proceeds of said sale: first, to the expense of advertising, selling and conveying said Property, including a reasonable attorney's fee; second, to the payment of any amounts that may have been expended or that may then be necessary to expend in paying insurance, taxes and other encumbrances, with interest thereon; third, to the payment in full of the principal indebtedness and interest thereon, whether the same shall or shall not have fully matured at the date of said sale, but no interest shall be collected beyond the date of said sale, and fourth, the balance, if any, shall be paid over to said Borrowers or to whomever then appears of record to be the owner of said Property. Lender may bid and become the purchaser of the Mortgaged Property at any foreclosure sale hereunder.

17. **Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued if: (a) Borrower pays Lender all sums which then would be due under this Mortgage, the Note and Notes securing Future Advances, if any, had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in section 16 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action, as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

18. **Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that so long as Borrower is not in default hereunder, Borrower shall, prior to acceleration under section 16 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration and/or foreclosure under section 16 hereof, or abandonment of the Property, Lender, in person or by agent, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Lender shall be liable to account only for those rents actually received prior to foreclosure sale as provided in section 16. Lender shall not be liable to account to Borrower or to any other person claiming any interest in the Property for any rents received after foreclosure.

19. **Loan Charges.** If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (a) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by mailing a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note.

20. **Legislation.** If, after the date hereof, enactment or expiration of applicable laws have the effect either of rendering the provisions of the Note, this Mortgage or any Rider, unenforceable according to their terms, or all or any part of the sums secured hereby uncollectible, as otherwise provided in this Mortgage or the Note, or of diminishing the value of Lender's security, then Lender, at Lender's option, may declare all sums secured by this Mortgage to be immediately due and payable.

21. **Satisfaction.** When the balance of all outstanding sums including finance charges and other charges, if any, secured by this Mortgage is zero, Lender shall upon request of Borrower, release this Mortgage. Borrower will pay all recordation costs, if any. Absent a request from Borrower, this Mortgage shall remain in full force and effect for the term set forth above. Lender, at Lender's option, may allow a partial release of the Property on terms acceptable to Lender and Lender may charge a release fee.

22. **Waiver of Homestead.** Borrower hereby waives all rights of homestead exemption in the Property and relinquishes all rights of dower and curtesy in the Property.

(2/02) FL Mortgage Open-End

**23. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal, or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this section 23, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this section 23, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection.

### REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
### UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender at Wachovia Bank, National Association, Retail Credit Servicing, P.O. Box 50010, Roanoke, VA 24022 of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage and adopted as his seal the word ("SEAL") appearing beside his name.

Signed, sealed and delivered in the presence of:

_____  _____ [SEAL]
Witness Signature            Borrower MARGARET N ALEXANDER TRUSTEE
                             Address 420 OAK HARBOUR LN UNIT 205
                                     DESTIN         FL   32541

_____  _____ [SEAL]
Witness Print Name  M. L. Schmel   Borrower
                                   Address

_____  _____ [SEAL]
Witness Signature            Borrower
                             Address

_____  _____ [SEAL]
Witness Print Name           Borrower
                             Address

STATE OF  Florida
COUNTY OF  Okaloosa

This foregoing instrument was acknowledged before me this 11th July 2003 (date) by Margaret N Alexander

who is personally known to me or who has produced  FL drivers license
(type of identification) as identification.

Pamela D Bonanno
Notary Public

PAMELA D BONANNO
Notary Public Name (Typed, Printed or Stamped)

*PAMELA D BONANNO*
*Notary Public - State of Florida*
*My Commission Expires Mar 3, 2006*
*Commission # DD 098904*
*Bonded By National Notary Assn.*

Return to: Wachovia Bank, National Association
P.O. Box 50010         s VA0343          (2/02) FL Mortgage Open-End
Roanoke, VA  24022

## Legal Description

Reference Number:

ALL THAT CERTAIN PROPERTY SITUATED IN THE CITY OF DESTIN IN THE COUNTY OF OKALOOSA AND STATE OF FLORIDA AND BEING DESCRIBED IN A DEED DATED 08/07/2001 AND RECORDED 08/10/2001 IN BOOK 2309 PAGE 4119 AMONG THE LAND RECORDS OF THE COUNTY AND STATE SET FORTH ABOVE AND REFERENCED AS FOLLOWS: UNIT 205, OAK HARBOUR CONDOMINIUM ACCORDING TO DECLARATION OF CONDOMINIUM RECORDED 04/08/1996 IN BOOK 1991, PAGE 2048, AND ANY AMENDMENTS THERE TO;



Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

March 20, 2010

Mr. James E. Hanson
Senior Vice President
Wells Fargo Bank, National Association
90 South Seventh Street
Minneapolis, MN 55479

Re: Applications to merge Wachovia Bank, National Association, Charlotte, North Carolina and Wachovia Bank of Delaware, National Association, Wilmington, Delaware with and into Wells Fargo Bank, National Association, Sioux Falls, South Dakota
Application Control Number: 2009-ML-02-0012

Dear Mr. Hanson:

This letter is the official acknowledgement, authorization and certification by the Office of the Comptroller of the Currency (OCC) that effective March 20, 2010 Wachovia Bank, National Association, Charlotte, North Carolina and Wachovia Bank of Delaware, National Association, Wilmington, Delaware merged with and into Wells Fargo Bank, National Association, Sioux Falls, South Dakota, under the title of the latter. As result of the merger, the OCC has renumbered the charter number of Wells Fargo Bank, National Association (the resulting bank) from charter number 1741 to charter number 1.

This letter is also the official authorization for Wells Fargo Bank, National Association to operate the former main office of Wachovia Bank of Delaware, National Association and the branch offices of Wachovia Bank, National Association and Wachovia Bank of Delaware, National Association as branches of Wells Fargo Bank, National Association. A list of branches for the resulting bank will be sent under separate cover.

If you have questions regarding this letter, please contact me at (202) 874-5294 or by e-mail at Stephen.Lybarger@occ.treas.gov. Please reference the application control number in any correspondence.

Sincerely,

Stephen A. Lybarger
Stephen A. Lybarger
Large Bank Licensing Lead Expert